## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff | ) | No.: 1:22-cr-10057-AK |
| | ) | |
| v. | ) | **LEAVE TO FILE UNDER SEAL** |
| | ) | **GRANTED ON JAN. 21, 2026** |
| MONICA CANNON-GRANT, | ) | |
| Defendant. | ) | |

### DEFENDANT MONICA CANNON-GRANT'S SENTENCING MEMORANDUM

Monica Cannon-Grant is a loving mother, wife, and daughter who has dedicated her life to advancing social justice and serving communities in need. She has inspired a generation of social activists to speak out against injustice and to support those around them who need a voice and access to daily essentials like food and housing. In the course of pursuing concrete advancements for the Boston community and beyond, however, Ms. Cannon-Grant made fundamental errors in judgment. She is deeply sorry and has now taken full responsibility for her actions.

For the reasons set forth in this memorandum and to be discussed at the sentencing hearing, Ms. Cannon-Grant respectfully submits that a sentence of two years' probation, no fine, and a mandatory special assessment fee of $1,650 is sufficient but not greater than necessary to achieve the goals of sentencing. *See* 18 U.S.C. § 3553(a).

### I.    PLEA AGREEMENT & SENTENCING GUIDELINES ANALYSIS

The parties entered into a plea agreement on September 18, 2025. ECF No. 209 (the "Plea Agreement"). Ms. Cannon-Grant agreed to plead guilty to Counts One through Three (Wire Fraud Conspiracy), Five (Mail Fraud), Nine through Thirteen, Fifteen through Seventeen, Twenty-One through Twenty-Two (Wire Fraud), and Twenty-Four through Twenty-Seven (Filing False Tax

1

Returns and Failure to File Tax Returns).[1]  *Id.* at ¶ 1.  The government agreed to dismiss Counts Four, Six through Eight, Fourteen, and Eighteen through Twenty.  *Id.*

The government agreed in the Plea Agreement that Ms. Cannon-Grant's Total Offense Level was 15, based, in part, on a 10-level increase under U.S.S.G. § 2B1.1(b)(1)(F) because the gain resulting from the Fraud Offenses was more than $150,000 but less than $250,000.  *Id.* at ¶ 3. The government also agreed that it would seek forfeiture of up to $250,000.  *Id.* at ¶ 6.  The parties agree that Ms. Cannon-Grant is eligible for a zero criminal history adjustment pursuant to U.S.S.G. § 4C1.1.  *Id.* at ¶ 3.

Post-*Booker*, the Supreme Court has directed that a district court should begin its  analysis by correctly calculating the defendant's Sentencing Guidelines range, though that range is not binding on the Court.  *See, e.g.*, *Gall v. United States*, 552 U.S. 38, 49 (2007) ("[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.").

The Probation Office ("Probation") has calculated Ms. Cannon-Grant's Total Offense Level and advisory Guidelines range the same way as the government: Total Offense Level of 15, which, with Ms. Cannon-Grant's zero criminal history adjustment, results in an advisory Guidelines range of 18–24 months' incarceration.  Presentence Report ("PSR") at ¶¶ 70–71, 130. Ms. Cannon-Grant agrees with that calculation.

---

[1] For the purposes of this Memorandum, Counts One through Three (Wire Fraud Conspiracy), Five (Mail Fraud), Nine through Thirteen, Fifteen through Seventeen, and Twenty-One through Twenty-Two (Wire Fraud) are grouped together as Count Group 1 pursuant to U.S.S.G. § 3D1.2(d) and referred to as the "Fraud Offenses."  PSR at ¶¶ 3, 49.  Counts Twenty-Four through Twenty-Seven (Filing False Tax Returns and Failure to File Tax Returns) are grouped together as Count Group 2 pursuant to U.S.S.G. § 3D1.2(d) and referred to as the "Tax Offenses."  *Id.*

## II.    GROUNDS FOR A BELOW-GUIDELINES SENTENCE OF TWO YEARS' PROBATION

Section 3553(a) of Title 18 of the United States Code exhaustively specifies the factors that the court must consider in imposing a sentence.  Section 3553(a) "is more than a laundry list of discrete sentencing factors; it is, rather, a tapestry of factors, through which runs the thread of an overarching principle.  That tenet . . . instructs district courts to impose a sentence sufficient, but not greater than necessary, to accomplish the goals of sentencing."  *United States v. Rodriguez*, 527 F.3d 221, 228 (1st Cir. 2008) (*quoting* 18 U.S.C. § 3553(a)) (cleaned up).  Ultimately, a district court "should . . . consider all the relevant [§ 3553(a)] factors as a group and strive to construct a sentence that is *minimally sufficient* to achieve the broad goals of sentencing."  *Id.* (emphasis added).  The court must also consider whether the Sentencing Commission's underlying policy results in a Sentencing Guidelines range that is unreasonably high.  *See, e.g., Kimbrough v. United States*, 552 U.S. 85, 101 (2007) ("[A]s a general matter, courts *may* vary [from Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines." (emphasis added)); *United States v. Prosperi*, 686 F.3d 32, 48 (1st Cir. 2012) (*citing Kimbrough*, 552 U.S. at 101).

### A.  The History and Characteristics of Ms. Cannon-Grant

#### i.  Childhood

Ms. Cannon-Grant was born and raised in Boston, Massachusetts.  PSR ¶¶ 81–82.  She grew up in the Franklin Hill Avenue section of Dorchester, which was a high-crime area.  *Id.* at ¶¶ 82, 84.  Beginning when she was a young child, Ms. Cannon-Grant frequently witnessed violence and crime, including shootings.  *Id.* at ¶ 84.  Ms. Cannon-Grant also experienced violence first-hand.  *Id.*  For instance, she was beaten on her way home from school when she was a teenager.  *Id.*

Ms. Cannon-Grant's home life was also traumatic and violent. *Id.* at ¶ 83. She grew up in deep poverty in the Wayne Apartments on Franklin Hill Avenue, a subsidized housing development. *Id.* at ¶ 84. Her family survived on welfare, food stamps, and Section 8 housing benefits. *Id.* She lived with both of her parents and her younger brother until she was 12 years old. *Id.* at ¶ 83. "Her father was an alcoholic and a 'violent drunk' who aggressively abused her mother, causing bruises and black eyes." *Id.* He would work during the week and spend his paycheck on alcohol at the end of the week. He would then beat Ms. Cannon-Grant's mother for the entire weekend, from Friday night to Monday morning. *Id.* Ms. Cannon-Grant and her younger brother had to hide in their bedrooms out of fear of being hit themselves. *Id.* Neither Ms. Cannon-Grant nor her brother ever intervened in the domestic violence for the same reason: fear. *Id.* Ms. Cannon-Grant's father was arrested for domestic violence. *Id.*

When she was 12 years old, Ms. Cannon-Grant's parents separated due to her father's domestic violence, but their separation was not the end of Ms. Cannon-Grant's trauma at home. *Id.* Ms. Cannon-Grant had a "toxic relationship" with her parents, and only saw her father sporadically after they separated. *Id.* Then, when she was only 15 years old, Ms. Cannon-Grant ██████████████████████████████████████. *Id.*

Ms. Cannon-Grant's parents both worked to provide for the family. *Id.* at ¶ 84. Therefore, Ms. Cannon-Grant was a "latchkey kid." *Id.* When she and her brother returned home after school, there was nobody there to look after them. *Id.* Instead, Ms. Cannon-Grant was forced to grow up early to provide for and help raise her younger brother. *Id.*

ii.  <u>Building Her Family</u>

When Ms. Cannon-Grant was in high school, she began dating her first husband, who was thirteen years older than she was. *Id.* at ¶ 88. She soon became pregnant and had to drop out of

high school in her junior year. *Id.* at ¶ 117. She gave birth to her first child, son Narayan, when she was just 18 years old. *Id.* at ¶ 88. As a result, Ms. Cannon-Grant transitioned directly from being a caregiver for her younger brother to being a caregiver for her young son. She married her then-boyfriend in 2006, but as is so often the case, her relationship sadly mirrored that of her parents. Ms. Cannon-Grant's first husband was abusive and unfaithful. *Id.* They had two more children together (daughters Ariyana and Aaliyah) before they separated in 2013. *Id.* Ms. Cannon-Grant's children from her first marriage are now 26, 24, and 22 years old, respectively. *Id.* at ¶¶ 89–91.

After escaping her first marriage, Ms. Cannon-Grant became the primary caretaker for her three children. Shortly thereafter, she began raising her young cousin Jaylen White as well. *Id.* at ¶ 95. Jaylen's parents both tragically passed away when he was only 14 years old. *Id.* Ms. Cannon-Grant took him into her home in 2014 and legally adopted him in December 2017. *Id.*

In 2016, Ms. Cannon-Grant met and began dating Clark Grant. *Id.* at ¶ 92. They got married in 2017 and were blessed with two children, ███████████████████████. *Id.* Ms. Cannon-Grant and Mr. Grant had a positive, loving relationship. *Id.* Unfortunately, tragedy struck Ms. Cannon-Grant again when Mr. Grant was killed in a motorcycle accident in March 2023 at the age of 39. *Id.* Mr. Grant was riding his motorcycle home from work when he was hit by a car and propelled 75 feet in the air. *Id.* He died on impact. *Id.* Ms. Cannon-Grant was at home with their two young children, ages 2 and 4 at the time, waiting for Mr. Grant to return. *Id.* When he failed to arrive, she frantically called the police and area hospitals looking for Mr. Grant. *Id.* Once she found him, Ms. Cannon-Grant was the one who had to go to identify his body. *Id.* Mr. Grant's death has taken a toll on Ms. Cannon-Grant and her children. Ms. Cannon-Grant described his death as "hell" and explained that "it continues to be hell." *Id.*

Ms. Cannon-Grant has a very strong relationship with all of her children. Following the death of their father, she has been the primary caretaker and consistent adult in the lives of her young sons ██████. *See Letter of Bishop William E Dickerson II* attached hereto as Exhibit A. ████████████████████████████████████████████████████. PSR at ¶ 92. Ms. Cannon-Grant also has an "amazing" relationship with her older children from her first marriage. *Id.* at ¶ 88. She speaks with them regularly and visits them any time that she can. *Id.*

In the past few years, in the wake of Mr. Grant's death, Ms. Cannon-Grant has begun to build a new relationship with an old friend, Joseph Banks. *Id.* at ¶ 98. In 2024, Ms. Cannon-Grant and Mr. Banks began dating. *Id.* They quickly became engaged and got married this past summer (May 2025). *Id.* ████████████████████████████████████████████, the boys are still getting to know Mr. Banks and are warming up to him. *Id.* at ¶¶ 93–94, 98.

### iii.    Finding Her Voice as a Social Activist

According to her mother, Ms. Cannon-Grant was "born with a passion to help and serve as a voice for others." *Id.* at ¶ 102. As a long-time resident of the Dorchester and Roxbury neighborhoods of Boston, Ms. Cannon-Grant was exposed to near-daily violence and poverty. *Id.* at ¶¶ 83–84, 97, 102. She understood what it was like to worry about where her next meal might come from and whether she would be able to afford a home for her family. *Id.*

While Ms. Cannon-Grant and her elder children were living in the Warren Gardens housing community in Roxbury around 2015, her life was transformed by that violence. *Id.* at ¶ 97. The Warren Gardens housing community was plagued by gang violence and criminal activity. *Id.* Ms. Cannon-Grant's eldest son, Narayan, had witnessed shootings and violence outside of their family home, but he was not personally involved in gangs or criminal activity. *Id.* Nevertheless, one day,

a boy with a gun approached Narayan outside of his home and aimed the gun at Narayan's head. If the gun had not jammed, Narayan would have been shot in the head at close range. *Id.* Another boy with a gun nearby also shot at Narayan, and the bullet barely missed him. *Id.* Narayan narrowly escaped with his life intact. *Id.* From that day forward, Ms. Cannon-Grant dedicated herself to stopping gun violence and promoting justice in her community, as well as throughout the country. *Id.*

Ms. Cannon-Grant made feeding the hungry, assisting housing insecure populations, and supporting victims of violence her key priorities. *Id.* at ¶ 102. She worked to connect those in need with resources and to help them succeed. *Id.* at ¶ 103. At first, Ms. Cannon-Grant led those efforts in a personal capacity. *Id.* at *40 (Cannon-Grant Objection #5 to Paragraph 8 (citing Nov. 1, 2021 Grand Jury testimony of Zeina Marchant)). In November 2017, Zeina Marchant offered to create a formal non-profit called Violence in Boston for Ms. Cannon-Grant and submitted the necessary paperwork on Ms. Cannon-Grant's behalf. *Id.* Violence in Boston's purpose was to reduce violence, raise social awareness, and aid community causes in the Greater Boston area. *Id.* at ¶ 8. Through her work with Violence in Boston, Ms. Cannon-Grant fed hungry people, facilitated college tours to Historically Black Colleges and Universities ("HBCUs"), and organized backpack drives for underserved children. *Letter of Bishop William E Dickerson II attached hereto as Exhibit A; Letter of DiDi Delgado attached hereto as Exhibit B; Letter of Aspen Eberhardt attached hereto as Exhibit C.* During the COVID pandemic, Ms. Cannon-Grant even drove around Boston hand delivering meals to at-risk community members in need. *Letter of Aspen Eberhardt attached hereto as Exhibit C.*

Ms. Cannon-Grant's own personal experiences and efforts in her community aligned with a broader movement for social justice across the United States. In the aftermath of George Floyd's

death,  Ms. Cannon-Grant stepped up to organize and lead rallies against violence and in support of racial justice across Boston.  *Letter of Bishop William E Dickerson II* attached hereto as Exhibit A.  When a group organizing a "Straight Pride" celebration came to Boston, Ms. Cannon-Grant helped to organize a peaceful counter protest to support the LGBTQ+ community.  *Letter of Aspen Eberhardt* attached hereto as Exhibit C.

But the violence in her neighborhood did not end simply because she started to organize and advocate against it.  In 2019, violence hit close to Ms. Cannon-Grant's home again.  Ms. Cannon-Grant was returning home from a conference one day when a local gang member shot 22 rounds at her house and vehicle.  PSR at ¶ 97.  There was nowhere for her to run.  One of the bullets missed her son Narayan by only inches.  *Id.*

Ms. Cannon-Grant does not just say that she believes in creating safer, more just communities, she puts those things in action.  Ms. Cannon-Grant's family, friends, and fellow social justice advocates remain incredibly proud of the work she has done.  Her mother "proudly reflected" on Ms. Cannon-Grant's "history of community involvement from feeding the hungry, obtaining housing for the homeless and returning citizens, and speaking on behalf of families who were victims of violence."  *Id.* at ¶ 102.  Bishop William E. Dickerson II of the Greater Love Tabernacle and Bishop of Restoration Ministry of Boston similarly reflected on how Ms. Cannon-Grant's organization "fed thousands of people during the Covid pandemic," "assisted single mothers in distressed families" with rent and utilities, and helped to ensure that "hundreds of children received wonderful Christmas gifts."  *Letter of Bishop William E Dickerson II* attached hereto as Exhibit A.  DiDi Delgado, a community organizer in Boston known for serving with the Black Lives Matter Cambridge Chapter, attests to Ms. Cannon-Grant's work organizing the Fight Supremacy March on the Boston Common in August 2017, supporting the family of a victim of

gun violence, and hosting grocery and backpack events for her Boston community. *Letter of DiDi Delgado* attached hereto as Exhibit B.

Ms. Cannon-Grant has found ways to continue to advance her ability to succeed as a social activist even as this case has been pending by furthering her education. She completed an eight-week course through HarvardX, an online learning initiative of Harvard University, on U.S. Public Policy: Social, Economic, and Foreign Policies. PSR at ¶ 117. She is also currently enrolled in two additional online courses. *Id.*

Ms. Cannon-Grant has inspired a generation of social activists throughout Boston and beyond. Ms. Delgado of the Cambridge Black Lives Matter Chapter describes Ms. Cannon-Grant as having a "magnetic personality" that inspires "important people and elected officials." *Letter of DiDi Delgado* attached hereto as Exhibit B. Aspen Eberhardt of Massachusetts writes: "Monica has also made a meaningful impact on me by showing me just how powerful and necessary community care and action can be. . . . I was moved by how Monica was committed to standing up to any injustice and how intentional she was to make sure that everyone's voice was heard." *Letter of Aspen Eberhardt* attached hereto as Exhibit C. Other members of the Boston community similarly credit Ms. Cannon-Grant with inspiring others to become more engaged, speak out against injustice, and believe in the possibility of a more just future. *Letter of Jakira Rogers* attached hereto as Exhibit D; *Letter of Megan Lim* attached hereto as Exhibit E. But Ms. Cannon-Grant's impact is not limited to Massachusetts. Ames Carpenter, an advocate in Western Michigan, writes that they have "learned from Monica" and continue to "share her ideas and perspective with [the] community in Michigan." *Letter of Ames Carpenter* attached hereto as Exhibit F.

iv.   <u>Physical & Mental Health</u>

Ms. Cannon-Grant's social activism was not without risk, particularly to her physical and mental well-being.  Ms. Delgado, who has personal experience with the risks of leading social justice work in our current climate,  writes that she and Ms. Cannon-Grant "tend to upset people when we highlight inequality and make others uncomfortable by insisting on accountability." *Letter of DiDi Delgado* attached hereto as Exhibit B.  Ms. Cannon-Grant has received threatening, harmful, racist, and abusive comments from members of the community and people on social media, many due to this case.  PSR ¶ 110.  Those threats are ongoing.  *Id.*  She fears for her safety and the safety of her family as a result.  *Id.*

Despite these serious medical conditions, Ms. Cannon-Grant does her best every day to put on a strong face and do whatever she can to improve the lives of those around her, including her two young children.

### B.  The Nature and Circumstances of Ms. Cannon-Grant's Offense

While she was running Violence in Boston, Ms. Cannon-Grant, along with her then-husband Clark Grant, who was a Director of Violence in Boston, solicited and received over $1 million in donations and grants.  PSR ¶¶ 8–9.  The majority of that money was deposited into a Violence in Boston bank account or PayPal account, though some of the checks were cashed immediately.  *Id.* at ¶¶ 9–10.  Ms. Cannon-Grant used some of the money to advance Violence in Boston's missions to reduce violence, raise social awareness, and aid community causes in the Boston area.  *Id.* at *40–42 (Cannon-Grant Objections #7 to Paragraphs 11–12, #8 to Paragraph 14, #9 to Paragraph 16, and #10 to Paragraph 18).  *See also Letter of DiDi Delgado* attached hereto as Exhibit B (describing how the donation from Black Lives Matter Cambridge chapter to Violence in Boston was used to host food and backpack events in the Boston community).

But Ms. Cannon-Grant also used some of the Violence in Boston funds to pay for expenditures that were not authorized by the terms of the grants or donations, including personal expenditures for herself and her family.  PSR ¶¶ 10–22.  Furthermore, she failed to disclose, whether to individuals involved with Violence in Boston, on applications for grants, or on official filings, that she was using some of the funds to pay for personal expenses.  *Id*.  The donations and grants at issue amount to $175,037.  *Id.* at ¶ 51; January 16, 2026 email from Senior Probation Officer Martha Victoria to the Court (informally modifying Paragraph 51 of the PSR to exclude $3,000 from the loss calculation).

Ms. Cannon-Grant also applied for and received government assistance that she was not eligible to receive. She received the assistance based on her false representations that she was not receiving other compensation at the time, including from Violence in Boston. First, during the pandemic, Ms. Cannon-Grant applied for and received $33,426 in Pandemic Unemployment Assistance (PUA) benefits by certifying that she was not receiving income at the time. *Id.* at ¶¶ 23–28. However, Ms. Cannon-Grant was, for a period of time, receiving payments from a consulting engagement and from Violence in Boston. *Id.* at ¶¶ 25–27. She was also using some Violence in Boston funds for personal expenditures during that time. *Id.* Second, Ms. Cannon-Grant and her husband applied for and received $12,600 in rental relief assistance from Boston's Office of Housing Stability (OHS) that they were not entitled to receive. *Id.* at ¶¶ 29–32. When they applied, Ms. Cannon-Grant and her husband failed to disclose the full extent of the income that the family was receiving, including Ms. Cannon-Grant's full income from Violence in Boston. *Id.* at ¶¶ 31–32.

Finally, Ms. Cannon-Grant failed to properly file her individual tax returns from 2017 to 2020. *Id.* at ¶¶ 33–37. Although she filed her individual tax returns in 2017 and 2018, her filings did not report the funds that she used from Violence in Boston toward her personal expenditures. *Id.* at ¶¶ 33–34. In 2019 and 2020, Ms. Cannon-Grant failed to file her individual tax returns, even though she received income from Violence in Boston and, in 2020, from a separate consulting engagement. *Id.* at ¶¶ 35–36. The tax losses associated with Ms. Cannon-Grant's failure to file proper personal income taxes were $19,667. *Id.* at ¶¶ 33–37.

### C. Excessive Guidelines Range Based on "Loss" Guideline

The single biggest factor in Ms. Cannon-Grant's Sentencing Guidelines calculation is the 10-point increase for Count Group 1 based on the loss amount of more than $150,000, but not

more than $250,000 pursuant to U.S.S.G. § 2B1.1(b)(1)(F). *See id.* at ¶ 52. Ms. Cannon-Grant's fraud-related conduct involved $224,063 in loss, (*id.* at ¶ 51; January 16, 2026 email from Senior Probation Officer Martha Victoria to the Court (informally modifying Paragraph 51 of the PSR)), but much of that money was, in fact, used to support underserved communities, families, and individuals in the Boston area and to advance social justice. For example, Ms. Cannon-Grant used a substantial portion of the funds from the Suffolk County District Attorney's Office to help house, feed, and support a family that was victimized by gun violence in Boston. *Id.* at *41 (Cannon-Grant Objection #8 to Paragraph 14). Volunteers on the ground also corroborate that Ms. Cannon-Grant provided meals to at-risk populations during the COVID pandemic, (*Letter of Bishop William E Dickerson II* attached hereto as Exhibit A; *Letter of Aspen Eberhardt* attached hereto as Exhibit C), thanks to the grant from the Boston Resiliency Fund. *Id.* at *41 (Cannon-Grant Objection #9 to Paragraph 16). Ms. Cannon-Grant admits that the terms of the grants she received did not allow her to spend the awarded funds the way that she did (including on personal expenditures) and that she was not truthful about the fact that she was using some of the funds for personal expenditures. She does not dispute that the full amount of the grants is therefore properly included within the fraud loss calculation at sentencing. But the loss calculations in this case overstate the appropriate punishment.

More generally, courts widely recognize that loss calculations lead to absurd Sentencing Guidelines ranges in white collar cases like this. *See, e.g.*, *United States v. Adelson*, 441 F. Supp. 2d 506, 515 (S.D.N.Y. 2006) (observing that "the calculations under the guidelines have so run amok that they are patently absurd on their face"). When that is the case, the court "is forced to place greater reliance on the more general considerations set forth in section 3553(a), as carefully applied to the particular circumstances of the case and of the human being who will bear the

consequences." *Id.*  Data from the Sentencing Commission reflects this broad discomfort with imposing sentences within the Guidelines in cases based on loss calculations in fraud cases.  For example, in 2025, within-guideline sentences were imposed only 43 percent of the time and downward departures or variances were applied 43 percent of the time.  *See* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/quarterly-sentencing-updates/USSC_Quarter_Report_4th_FY25.pdf  (last accessed Jan. 20, 2026) (Table 10).

This case presents exactly the same issue—the loss calculation Guidelines result in a Sentencing Guidelines range that far exceeds what is necessary to accomplish the goals of sentencing.  Therefore, the Court should afford Ms. Cannon-Grant's particular circumstances, as set forth herein, more weight than in a standard case in which the Guidelines range is calculated based on more concrete factors.

### D.  Need to Avoid Unwarranted Sentencing Disparities

In fashioning an appropriate sentence, judges are directed by statute to consider "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct."  *United States v. Reyes-Santiago*, 804 F.3d 453, 467 (1st Cir. 2015).  During the last five fiscal years for which data is available (2020–2024), there were 498 defendants whose primary guidelines was U.S.S.G. § 2B1.1, with a Final Offense Level of 15 and a Criminal History Category of I (excluding defendants who received a § 5K1.1 substantial assistance departure).  PSR ¶ 149.  Of those defendants, 33 percent of them did not receive a sentence of imprisonment.  As set forth in this Memorandum, Ms. Cannon-Grant's personal history and exceptional community service place her squarely on par with this group of defendants such that she should receive a non-incarcerative sentence.

14

### E.  A Fine is Not Appropriate Here in Light of Forfeiture

In light of the forfeiture the government is seeking in this case—$227,063—and the potential restitution at issue—$106,003[2]—any additional fine would be excessive.  This is not a typical case in which a fine is appropriate.  Ms. Cannon-Grant will already be paying significant sums as part of her penance for her conduct.  Ms. Cannon-Grant's current household income is minimal.  She and her husband are relying on her Social Security survivor benefits from Mr. Grant's death for herself and her children.  PSR ¶ 127.  Her husband recently lost his job and is currently unemployed.  *Id.*  Ms. Cannon-Grant also has a number of outstanding liabilities.  *Id.* at ¶ 126.  Imposing a fine on top of the sum already at issue is not necessary for deterrence purposes— forfeiture and/or restitution in this case are more than sufficient in light of her financial resources.

### F.  A Sentence of Two Years' Probation Is Appropriate

Ms. Cannon-Grant believes that the requested sentence of two years' probation is sufficient but not greater than necessary to achieve the varied goals of 18 U.S.C. § 3553(a), even though it is below the Sentencing Guidelines recommendation.  Here, Ms. Cannon-Grant's unique personal circumstances—including the trauma she has experienced and her two young children who depend on her—and her exceptional community service weigh strongly in favor of a below-Guidelines sentence.

i.  <u>Personal Circumstances</u>

Ms. Cannon-Grant was raised in deep poverty.  Her family relied on welfare, food stamps, and Section 8 housing to survive.  Growing up in Dorchester, Ms. Cannon-Grant was exposed to

---

[2] Although the PSR states that Probation identified restitution totaling $116,403, Ms. Cannon-Grant understands, based on prior discussions with Probation, that an update to the PSR is forthcoming.  Probation informed Ms. Cannon-Grant that TJX Companies, Inc. is not pursuing restitution, reducing the restitution amount identified by Probation by $10,400, bringing the total number to $106,003.  Cambridge Black Lives Matter is also not pursuing restitution.

neighborhood violence, domestic abuse, and ███████, all by the age of 15.  As a child, she witnessed her father's alcohol-fueled battery of her mother on a weekly basis.  Ms. Cannon-Grant was also exposed to the legal justice system at a young age as a result, when her father was arrested for domestic violence.  She grew up in fear of being physically abused herself.  ████████████ ██████████████████████████████████████████████████

Ms. Cannon-Grant had to drop out of high school when she was only in her junior year after she became pregnant by her first husband, who was thirteen years her senior.  He also abused her.

Ms. Cannon-Grant also grew up and lived in neighborhoods marred by violence until she left Boston in 2021.  She has experienced the gripping fear of hiding outside of her home while bullets flew by, hitting her home and car, without knowing whether her family was safe.  She has experienced the grief and shock of knowing that her son's life was spared from gun violence only by a miracle after the gun pointed at his head in close range jammed.

That fear and trauma drove Ms. Cannon-Grant to advocate and organize for change in an effort to ensure that no other child, sibling, or parent would have to go through what she did.  But it also warped her sense of right and wrong when it came to handling important financial affairs, leading her down a path that she has come to deeply regret.  Ms. Cannon-Grant is ready to take responsibility for her actions and turn the next page in her story.  She is committed to living a life of service to her family and her community.

    ii.   <u>Extraordinary Family Circumstances: Raising Two Young Children Who Tragically Lost Their Father</u>

Ms. Cannon-Grant is  still suffering from the trauma of losing her beloved husband and the father of her two youngest children, Mr. Grant.  But Ms. Cannon-Grant has been a caregiver for nearly her entire life—for her younger brother, her children, her orphaned nephew, and then for

members of her community in need—so she knows what it takes to put others before herself. Despite her pain, Ms. Cannon-Grant is a dedicated and loving mother whose presence during this period in her young children's lives is a matter of great importance. Ms. Cannon-Grant's two young boys have already tragically lost their father, who was killed in a motorcycle accident when they were only 2 and 4 years old, respectively. ████████████████████████ █████████████████████████████████████████████████████ Ms. Cannon-Grant has been their primary caretaker. Ms. Cannon-Grant stays at home full-time with the boys to ensure that they have the support and care that they need. The boys remain emotionally fragile, and Ms. Cannon-Grant is an indispensable element of their well-being.

Extraordinary family circumstances may serve as the basis for a below-Guidelines sentence. *See, e.g.*, *United States v. Schroeder*, 536 F.3d 746, 756 (7th Cir. 2008) ("When a defendant presents an argument for a lower sentence based on extraordinary family circumstances, the relevant inquiry is the effect of the defendant's absence on his family members."); *United States v. Johnson*, 964 F.2d 124, 129 (2d Cir. 1992) ("The rationale for a downward departure here is not that [the defendant's] family circumstances decrease her culpability, but that we are reluctant to wreak extraordinary destruction on dependents who rely solely on the defendant for their upbringing.").[3] Courts have found extraordinary family circumstances exist where the defendant was a mother who was solely responsible for the upbringing of four young children, even where those children were not struggling with the tragic death of their other parent. *Johnson*, 964 F.2d at 129.

---

[3] Ms. Cannon-Grant recognizes that her exceptional family circumstances do not decrease her culpability. The possibility that this case could separate her from her sons, ages 4 and 6, has caused her an enormous amount of anxiety and grief.

Although the boys are beginning to warm up to Ms. Cannon-Grant's new husband, they have only known him a short while. Ms. Cannon-Grant is the sole person they rely on to ensure they receive the emotional support that they need. As the surviving parent of both young boys, Ms. Cannon-Grant plays a critical role in their upbringing and ability to thrive after the tragic loss of their father.

### iii. Exceptional Community Service Contributions

Ms. Cannon-Grant has worked tirelessly as a local organizer to further her goals of ending violence in Boston, providing resources to people in need, and promoting social justice. Her efforts included providing backpacks to underserved children, preparing and delivering meals to at-risk members of the community during the COVID pandemic, organizing protests and marches that drew tens of thousands of people, and giving a voice to marginalized populations. She led a march of 40,000 people from the Reggie Lewis Gym to the Boston Common in support of racial justice and organized a peaceful counter-protest against a "Straight Pride" celebration. *Letter of Susan Stange* attached hereto as Exhibit G.

Where the record at sentencing establishes that the defendant's "community involvement and exemplary personal record of achievements in the community" are "sufficiently unusual and 'outside the heartland of cases,'" a downward departure from the Guidelines is warranted. *United States v. Kuhn*, 351 F. Supp. 2d 696, 705 (E.D. Mich. 2005). In *Kuhn*, the court credited the defendant's extensive community volunteer work, as well as the fact that he was "personally involved in community service and did not merely give financial contributions to the organizations." *Id.* Therefore, the court found that he was entitled to a downward departure from the advisory Sentencing Guidelines based on his community service. *Id.*

18

There is no doubt that Ms. Cannon-Grant's personal contributions to the Boston community far surpass those of a usual citizen.  Moreover, as in *Kuhn*, a large number of individuals, including community members and civil leaders have written letters on her behalf detailing the work that Ms. Cannon-Grant did, day-after-day, to promote social justice throughout Boston and beyond and urging leniency.  *See Letter of Bishop William E Dickerson II* attached hereto as Exhibit A;  *Letter of DiDi Delgado* attached hereto as Exhibit B; *Letter of Aspen Eberhardt* attached hereto as Exhibit C; *Letter of Jakira Rogers* attached hereto as Exhibit D; *Letter of Megan Lim* attached hereto as Exhibit E; *Letter of Ames Carpenter* attached hereto as Exhibit F; *Letter of Susan Stange* attached hereto as Exhibit G.  Ms. Cannon-Grant's exemplary record of community service and her dedication to improving the lives of those around her, despite her own traumatic struggles, supports a below-Guidelines sentence.

## CONCLUSION

Based on the unique aspects of Ms. Cannon-Grant's personal history and characteristics—including, in particular, her children's dependency on her as their sole caretaker and her exemplary community service—and the overstated impact of the loss calculations under the Sentencing Guidelines, we respectfully request that Ms. Cannon-Grant be sentenced to a below-Guidelines sentence of two-years' probation,  no fine, and a mandatory special assessment of $1,650.

Dated: January 22, 2026

Respectfully submitted,
MONICA CANNON-GRANT
By her attorneys,


*/s/ Emma Notis-McConarty*
George W. Vien, BBO #547411
Emma Notis-McConarty, BBO #696405
DONNELLY, CONROY & GELHAAR, LLP
260 Franklin Street, Suite 1600
Boston, MA 02110
gwv@dcglaw.com
enm@dcglaw.com
(617) 720-2880

<u>CERTIFICATE OF SERVICE</u>

     I hereby certify that a true copy of the above document will be sent electronically by email to counsel for the government and to the Probation Office on January 22, 2026.


                   */s/ Emma Notis-McConarty*
                   Emma Notis-McConarty